# No. 21-13468

# United States Court of Appeals

*for the*

# Eleventh Circuit

JONATHAN MULLANE,

*Plaintiff/Appellant,*

– v. –

FEDERICO A. MORENO, DOES 1 through 10, Inclusively, in their individual and official capacities, UNITED STATES OF AMERICA,

*Defendants/Appellees,*

ALISON W. LEHR, et al., Inclusively, in their individual and official capacities,

*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 1:20-cv-21339-AKK
(Hon. Abdul K. Kallon)

# AMENDED INITIAL BRIEF OF APPELLANT

JONATHAN MULLANE
6 Bennett Street
Cambridge, Massachusetts 02138
(617) 800-6925

*Pro Se Appellant*

COUNSEL PRESS • VA – (804) 648-3664

*Mullane v. Moreno, et al.*, No. 21-13468-H

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 28-1(b) and Fed. R. App. P. 26.1, the undersigned hereby certifies that the following persons and/or entities may have an interest in the outcome of this case:

Jonathan Mullane, Plaintiff-Appellant

Federico A. Moreno, Defendant-Appellee

Benjamin G. Greenberg, Defendant-Appellee

Alison W. Lehr, Defendant-Appellee

Lisa T. Roberts, Defendant-Appellee

United States of America, Defendant-Appellee

E. Peter Mullane, Esq., Interested Party

Karin Wherry, Esq., Interested Party

Dexter Lee, Esq., Interested Party

Emily M. Smachetti, Esq., Interested Party

Ariana Fajardo Orshan, Interested Party

Juan Antonio Gonzalez, Interested Party

United States District Judge Abdul K. Kallon, Interested Party

United States District Judge Michael Moore, Interested Party

United States Department of Justice, Interested Party

C-1

*Mullane v. Moreno, et al.*, No. 21-13468-HH

United States Attorney's Office, Interested Party

United States Securities and Exchange Commission, Interested Party

Florida Board of Bar Examiners, Interested Party

Massachusetts Board of Bar Examiners, Interested Party

University of Miami, Interested Party

U.S. District Court for the Southern District of Florida, Interested Party

The undersigned further certifies that no publicly-listed or traded company, corporation, or entity holds any ownership interest in any party herein or has any interest in the outcome of this case to the extent of his knowledge.

/s/ Jonathan Mullane
JONATHAN MULLANE

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This appeal addresses *inter alia* the applicability of the narrow exception to absolute judicial immunity promulgated in <u>Harper v. Merckle</u>, 638 F.2d 848 (5th Cir. 1981) (Hill, J.), which remains binding law in the Eleventh Circuit. Because the case law relating to this carved-out exception is extremely limited, it is respectfully submitted that oral argument would likely be beneficial and constructive.

/s/ Jonathan Mullane
JONATHAN MULLANE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................vi

ISSUES PRESENTED ON APPEAL.........................................................2

STATEMENT OF THE CASE...................................................................4

    I.    Statement of the Facts ..............................................4

    II.   Standard of Review .................................................5

SUMMARY OF THE ARGUMENT .........................................................5

ARGUMENTS ...........................................................................................8

    I.    THE DISTRICT COURT'S DECISION TO MAKE ITS OWN FACTUAL DETERMINATIONS AT THE RULE 12 STAGE OF THE PROCEEDING, WHERE NO DISCOVERY WAS ALLOWED AND NO EVIDENTIARY HEARING WAS HELD—AND TO THEREUPON DISMISS THIS ACTION "WITH PREJUDICE"—GIVES RISE TO REVERSIBLE ERROR ........................................8

    II.   UNDER CODD v. VELGER, 429 U.S. 624 (1977) AND JOHNSTON v. BORDERS, 724 FED. APP'X 762 (11TH CIR. FEB. 9, 2018), THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFF WAS NOT ENTITLED TO A "NAME CLEARING" AND/OR CODD HEARING FROM BOTH THE MIAMI USAO AND THE SEC ........................14

    III.  THE DISTRICT COURT'S ALLOWANCE OF JUDICIAL IMMUNITY VIOLATES THE HOLDING OF HARPER v. MERCKLE, 638 F.2D 848 (5TH CIR. 1981) (HILL, J.), A BINDING PRECEDENT WITHIN THE ELEVENTH CIRCUIT ........................................................17

    IV.  THE DISTRICT COURT ERRED IN GRANTING JUDICIAL IMMUNITY FOR "PROSECUTORIAL ACTS" WHICH ARE NOT NORMALLY PERFORMED BY A JUDGE; THIS COURT SHOULD AVOID A CIRCUIT SPLIT WITH THE THIRD, SIXTH, AND SEVENTH CIRCUITS ......................................................21

V.    IT WAS ERROR FOR THE DISTRICT COURT TO
BESTOW JUDICIAL IMMUNITY FOR A CRIMINAL
CONTEMPT HEARING WHICH WAS NOT WITHIN THE
DEFENDANT JUDGE'S SUBJECT-MATTER
JURISDICTION IN THE FIRST PLACE ..........................................23

VI.   IT WAS ERROR FOR THE DISTRICT COURT TO
GRANT JUDICIAL IMMUNITY FOR THE SPECIFIC
TORTIOUS ACTS RELATING TO THE DEFENDANT
JUDGE'S INTERFERENCE WITH PLAINTIFF'S
EMPLOYMENT AGREEMENTS, BECAUSE THE
DEFENDANT JUDGE LACKED ANY COLORABLE
SUBJECT-MATTER JURISDICTION OVER PLAINTIFF'S
FEDERAL EMPLOYMENT ..............................................................25

VII.  THE DISTRICT COURT'S ALLOWANCE OF
QUALIFIED IMMUNITY GIVES RISE TO REVERSIBLE
ERROR IN LIGHT OF THE FACT THAT: (1) ALL OF
THE TORTIOUS CONDUCT COMPLAINED OF HERE
WAS ULTRA VIRES, AND NOT PART OF
DEFENDANTS' RESPECTIVE JOB DESCRIPTIONS
AND/OR PROFESSIONAL RESPONSIBILITIES IN THE
FIRST PLACE; (2) THE FIRST, FOURTH, AND FIFTH-
AMENDMENT RIGHTS IMPLICATED HERE WERE,
AND STILL REMAIN, "CLEARLY ESTABLISHED"
UNDER NUMEROUS ELEVENTH CIRCUIT CASE
PRECEDENTS; AND (3) IN HOPE v. PELZER, 536 U.S.
730 (2002), THE SUPREME COURT REJECTED THE
ELEVENTH CIRCUIT'S "MATERIALLY SIMILAR
CASE" REQUIREMENT FOR PLAINTIFFS TO DEFEAT
AND/OR OVERCOME A QUALIFIED IMMUNITY
DEFENSE ..........................................................................................28

      (a)   Conduct which is ultra vires, and not part of the federal
            employees' job responsibilities in the first place, is not
            eligible for qualified immunity; it was error for the
            district court to place the burden of proof on Plaintiff,
            requiring him to prove that Defendants were not acting
            within their respective job descriptions .....................................28

(b)    All of the First, Fourth, and Fifth-Amendment rights implicated in this case were, and still remain, "clearly established" within the Eleventh Circuit ..................................32

    (1)    "Clearly established" First Amendment rights within the Eleventh Circuit...............................32

    (2)    "Clearly established" Fourth Amendment rights within the Eleventh Circuit...............................33

    (3)    "Clearly established" Fifth Amendment rights within the Eleventh Circuit...............................35

(c)    The district court's ruling that Plaintiff was required to locate and cite a factually-identical Eleventh Circuit case was misplaced; that requirement is no longer good law, and the Eleventh Circuit's "materially similar case" requirement was specifically rejected by the Supreme Court of the United States in Hope v. Pelzer, 536 U.S. 730 (2002)...................................36

VIII.    WHERE DEFENDANT FEDERAL EMPLOYEES DELIBERATELY "LEAKED" DEFAMATORY AND HIGHLY-STIGMATIZING INFORMATION TO NATIONAL MEDIA PUBLICATIONS, THE DISTRICT COURT'S ALLOWANCE OF WESTFALL ACT SUBSTITUTION VIOLATED THE BINDING ELEVENTH CIRCUIT PRECEDENT OF NADLER v. MANN, 951 F.2D 301 (11TH CIR. 1992) ......................................36

IX.    THE DISTRICT COURT ERRRED IN RELYING UPON THE JUDGMENT OF ANOTHER DISTRICT COURT WHICH WAS "NULL AND VOID" FOR WANT OF PROCEDURAL DUE PROCESS AS A MATTER OF LAW UNDER THE BINDING CASE PRECEDENTS OF THE SUPREME COURT OF THE UNITED STATES .............................39

X.    BY CONCLUDING THAT RICO'S OPEN-ENDED CONTINUITY REQUIREMENTS ARE NOT SATISFIED IN THIS ACTION, THE DISTRICT COURT BELOW VIOLATED THE SUPREME COURT'S "CONTINUITY PLUS RELATIONSHIP" TEST ........................................42

XI.    IN HOLDING THAT RICO'S CLOSED-ENDED
CONTINUITY REQUIREMENTS ARE NOT SATISFIED
HERE, THE DISTRICT COURT COMMITTED
REVERSIBLE ERROR BY FAILING TO TAKE THE
FACTUAL ALLEGATIONS OF THE COMPLAINT AS
TRUE INSOFAR AS THEY RELATE TO THOSE
PARTICULAR REQUIREMENTS ...................................................45

XII.    ON THE CIVIL RICO CONSPIRACY COUNT, THE
DISTRICT COURT ERRRED IN FAILING TO CONSIDER
THAT A REASONABLE FACTFINDER MAY INFER, AT
THE TIME OF TRIAL, THAT EACH DEFENDANT
"AGREED TO THE OVERALL OBJECTIVE OF THE
CONSPIRACY" ...................................................................................49

XIII.    THE DISTRICT COURT BELOW ERRED IN
DISMISSING THE FICTITIOUS-PARTY "JOHN DOE"
DEFENDANTS AT THE PRE-DISCOVERY RULE 12
STAGE; THIS COURT SHOULD AVOID A CIRCUIT
SPLIT BETWEEN THE ELEVENTH CIRCUIT AND THE
FIFTH CIRCUIT ON THIS PARTICULAR ISSUE ..........................50

CONCLUSION ......................................................................................................51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

ADA v. Cigna Corp.,
  605 F.3d 1283 (11th Cir. 2010) ................................................................... 44, 51

Adams v. Ford Motor Co.,
  653 F.3d 299 (3d Cir. 2011) .................................................................40

Allstate Ins. Co. v. Quick,
  254 F. Supp. 2d 706 (S.D. Ohio 2002) .................................................39

Anderson v. United States,
  364 Fed. App'x 920 (5th Cir. 2010) ....................................................39

Anderson v. Valdez,
  845 F.3d 580 (5th Cir. 2016) ...............................................................33

Apothecary Dev. Corp. v. City of Marco Island Fla.,
  517 F. App'x 890 (11th Cir. 2013) ......................................................35

Armstrong v. Thompson,
  759 F. Supp. 2d 89 (D.D.C. 2011) .......................................................39

Bank of America v. Touche Ross & Co.,
  782 F.2d 966 (11th Cir. 1986) .............................................................44

Bible v. United Student Aid Funds, Inc.,
  799 F.3d 633 (7th Cir. 2015) ...............................................................45

Blalock v. United States,
  844 F.2d 1546 (11th Cir. 1988) ...........................................................39

Bloom v. Illinois,
  391 U.S. 194 (1968) .............................................................................40

Bray v. United States,
  423 U.S. 73 (1975) ...............................................................................23

Bush Ranch v. E.I. DuPont de Nemours & Co.,
  99 F.3d 363 (11th Cir. 1996) ...............................................................39

Campbell v. Pierce County,
  741 F.2d 1342 (11th Cir. 1984) ...........................................................16

Carollo v. Boria,
    833 F.3d 1322 (11th Cir. 2016) ...........................................................32

Codd v. Velger,
    429 U.S. 624 (1977) ..................................................................... 2, 14

Cooke v. United States,
    267 U.S. 515 (1925) ...........................................................................40

Cox v. Adm'r U.S. Steel & Carnegie,
    17 F.3d 1386 (11th Cir. 1994) ...........................................................44

DeGuelle v. Camilli,
    664 F.3d 192 (7th Cir. 2011) ..................................................... 46, 47, 48

Doe v. U.S. Dep't of Justice,
    753 F.2d 1092 (D.C. Cir. 1985) ..........................................................17

Dragash v. Saucier,
    2017 U.S. App. LEXIS 23183 (11th Cir. Sep. 26, 2017) ....................12

Earle v. McVeigh,
    91 U.S. (1875) ....................................................................................42

El Omari v. Ras Al Khaimah Free Trade Zone Auth.,
    2017 U.S. Dist. LEXIS 68371 (S.D.N.Y. 2017) ................................12

Eleanora J. Dietlein Tr. v. Am. Home Mortg. Inv. Corp.,
    2014 U.S. Dist. LEXIS 29576 (D. Nev. Mar. 7, 2014) .......................12

Ellis v. Thornsbury,
    2016 U.S. Dist. LEXIS 69877 (S.D. W. Va. May 27, 2016) ..............18

Giron v. Chaparro,
    2004 U.S. Dist. LEXIS 35375 (D.N.M. Dec. 8, 2004) .......................18

Goldhaber v. Higgins,
    2009 U.S. Dist. LEXIS 16648 (W.D. Pa. Mar. 3, 2009) .....................18

Gompers v. Bucks Stove and Range Co.,
    221 U.S. 418 (1911) ..................................................................... 23, 40

Green v. Doe,
    260 F. App'x 717 (5th Cir. 2007) .......................................................50

Gregory v. Thompson,
    500 F.2d 59 (9th Cir. 1974) .......................................................... 20, 25

Grubbs v. Sheakley Group, Inc.,
   807 F.3d 785 (6th Cir. 2015) .................................................................45

Grunewald v. United States,
   353 U.S. 391 (1957) ...........................................................................43

H. J. Inc. v. Nw. Bell Tel. Co.,
   492 U.S. 229 (1989) ............................................................... 42, 43, 45

Harper v. Merckle,
   638 F.2d 848 (5th Cir. 1981) ................................................ 2, 17, 18, 19

Harris v. Harvey,
   605 F.2d 330 (7th Cir. 1979) .................................................................18

HOPE v. PELZER,
   536 U.S. 730 (2002) ...................................................................... 28, 36

Hunter v. Bryant,
   502 U.S. 224 (1991) ...........................................................................17

I.N.S. v. Delgado,
   466 U.S. 210 (1984) ...........................................................................34

Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.,
   783 So. 2d 353 (Fla. 3d DCA 2001) .......................................................38

In re Sadin,
   509 F.2d 1252 (2d Cir. 1975) ................................................................41

In re Sch. Asbestos Litig.,
   977 F.2d 764 (3d Cir. 1992) ..................................................................13

In re Troutt,
   460 F.3d 887 (7th Cir. 2006) .................................................................40

Johnston v. Borders,
   724 Fed. App'x 762 (11th Cir. Feb. 9, 2018) ................................... *passim*

Kessler v. Crichton,
   221 F.3d 1342 (8th Cir. 2000) ...............................................................42

Lane v. Franks,
   573 U.S. 228 (2014) ...................................................................... 32, 33

Liberty Mut. Ins. Co. v. Commer. Concrete Sys., LLC,
   2017 U.S. Dist. LEXIS 50786 (N.D. Fla. Apr. 1, 2017) .......................12

Lopez v. Vanderwater,
    620 F.2d 1229 (7th Cir. 1980) ........................................................ 19, 21

Manago v. Davey,
    2018 U.S. Dist. LEXIS 216320 (E.D. Cal. Dec. 21, 2018) .................................12

McAlester v. Brown,
    469 F.2d 1280 (5th Cir. 1972) ........................................................ 18, 19

Nadler v. Mann,
    951 F.2d 301 (11th Cir. 1992) ........................................................ 3, 36, 37, 38

Pagán-González v. Moreno,
    919 F.3d 582 (1st Cir. 2019) ..............................................................34

Pulliam v. Allen,
    466 U.S. 522 (1984) ....................................................................21

Randall v. Offplan Millionaire AG,
    2020 U.S. Dist. LEXIS 83876 (M.D. Fla. Apr. 21, 2020) ....................................43

Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,
    119 F.3d 935 (11th Cir. 1997) ............................................................49

Rodd v. Region Constr. Co.,
    783 F.2d 89 (7th Cir. 1986) ..............................................................42

Rodemaker v. Shumphard,
    2021 U.S. App. LEXIS 16986 (11th Cir. 2021) ..............................................28

Sarabia-Arredondo v. United States AG,
    853 F. App'x 511 (11th Cir. 2021) ........................................................5

SEC v. Pension Fund of Am., L.C.,
    396 Fed. Appx. 577 (11th Cir. 2010) (per curiam ............................................40

Sevier v. Turner,
    742 F.2d 262 (6th Cir. 1984) .............................................................22

Stonebridge Collection, Inc. v. Carmichael,
    791 F.3d 811 (8th Cir. 2015) .............................................................45

Tarver v. Reynolds,
    808 F. App'x 752 (11th Cir. 2020) ........................................................21

Taylor v. Brooks,
    2020 U.S. Dist. LEXIS 103575 (N.D. Ala. June 12, 2020) ...................................50

Tramonte v. Chrysler Corp.,
   136 F.3d 1025 (5th Cir. 1998) ........................................................ 20, 24

United States v. Church,
   955 F.2d 688 (11th Cir. 1992) ................................................................49

United States v. Dixon,
   509 U.S. 688 (1993) ................................................................................40

United States v. Holtzman,
   762 F.2d 720 (9th Cir. 1985) ..................................................................42

United States v. Hutchinson,
   633 F.2d 754 (9th Cir. 1980) ..................................................................41

United States v. J. Myers Schine,
   260 F.2d 552 (2d Cir. 1958), cert. denied, 358 U.S. 934 (1959) ..........41

United States v. Joyce,
   498 F.2d 592 (7th Cir. 1974) ..................................................................41

United States v. King,
   2006 U.S. Dist. LEXIS 86370 (M.D. Ala. 2006) ...................................33

United States v. Mendenhall,
   446 U.S. 544 (1980) ................................................................................34

United States v. Moncier,
   571 F.3d 593 (6th Cir. 2009) ..................................................................23

United States v. Tweel,
   550 F.2d 297 (5th Cir. 1977) ..................................................................33

United States v. United Mine Workers of America,
   330 U.S. 258 (1947) ................................................................................41

Vierria v. Cal. Highway Patrol,
   644 F. Supp. 2d 1219 (E.D. Cal. 2009) ..................................................48

Wallace v. Powell,
   2014 U.S. Dist. LEXIS 2908 (M.D. Pa. Jan. 9, 2014) ..........................21

Washington v. Rivera,
   939 F.3d 1239 (11th Cir. 2019) ..............................................................21

Wilson v. Rackmill,
   878 F.2d 772 (3d Cir. 1989) ...................................................................21

Zinermon v. Burch,
  494 U.S. 113 (1990) ...........................................................................15

## Statutes & Other Authorities:

5 U.S.C. § 552a(i) .............................................................................38

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1294(1) ..........................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1367(a) ...........................................................................1

28 U.S.C. § 1367(c) ...........................................................................1

31 U.S.C. § 1304 (2018) ....................................................................7

42 U.S.C. § 1983 ...............................................................................15

42 U.S.C. § 1985(1) ...........................................................................9

Code of JudicialConduct, Rule 2.9(A)(1) .......................................12

Fed. R. App. P. 4 ...............................................................................1

Fed. R. App. P. 4(a)(1)(B)(i) .............................................................1

Fed. R. App. P. 4(a)(4)(A)(iv)-(vi) ...................................................1

Fed. R. App. P. 26(c) .........................................................................1

Fed. R. App. P. 32(a)(5) ....................................................................52

Fed. R. App. P. 32(a)(6) ....................................................................52

Fed. R. App. P. 32(a)(7)(B) ..............................................................52

Fed. R. Civ. P. 59 ..............................................................................1

Fed. R. Civ. P. 60 ..............................................................................1

Fed. R. Crim. P. 42(a) .......................................................................40

Fed. R. Crim. P. 42(a)(3) .....................................................23, 24, 25

Fed. R. Crim. P. 42(b) .......................................................................41

## JURISDICTIONAL STATEMENT

Subject-matter jurisdiction is proper in this action pursuant to 28 U.S.C. § 1331 because the claims asserted primarily arise under the United States Constitution and federal law. The district court properly exercised supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367(a).[1] This Court has appellate jurisdiction over the "final judgment" of the district court below pursuant to 28 U.S.C. §§ 1291, 1294(1) as well as Fed. R. App. P. 4 ("APPEAL AS OF RIGHT"). This appeal is timely because: (1) the United States is a party to this proceeding, see Fed. R. App. P. 4(a)(1)(B)(i) (extending the time to appeal to 60 days after the entry of judgment); and (2) a timely motion for reconsideration[2] under Fed. R. Civ. P. 59 and 60 was filed in the district court below, see Fed. R. App. P. 4(a)(4)(A)(iv)-(vi) (tolling the time within which to file a notice of appeal).

Here, the district court entered its "final judgment" dismissing the action on August 2, 2021. See D.E. 90 ("Order Dismissing Case"). The following day, on

---

[1] The Florida state-law claims asserted are part and parcel to the same controversy created by Defendants-Appellees' ("Defendants") ongoing violations of the Constitution and laws of the United States. The said claims do not involve a novel and/or complex interpretation of Florida law, nor do they predominate over the federal claims here. See 28 U.S.C. § 1367(c).

[2] Also relevant here is the three (3) additional days afforded under Fed. R. App. P. 26(c) in light of the fact that all filings were mailed. The district judge to whom this cause was reassigned denied Plaintiff's unopposed motion for leave to file electronically via the CM/ECF platform. See D.E. 44.

August 3, 2021, Plaintiff-Appellant Jonathan Mullane ("Plaintiff")[3] submitted a motion for reconsideration vis-à-vis the order of dismissal. See D.E. 91-92. On October 6, 2021, the district court denied the motion for reconsideration. See D.E. 104. One day later, on October 7, 2021, Plaintiff timely filed a notice of appeal in the district court below. See D.E. 105.

## ISSUES PRESENTED ON APPEAL

(1)    Was it error for the district court to make findings of fact at the Rule 12 stage of the proceeding, and to thereupon dismiss this case "with prejudice"?

(2)    Under Codd v. Velger, 429 U.S. 624 (1977) and Johnston v. Borders, 724 Fed. App'x 762 (11th Cir. Feb. 9, 2018), did the district court err in concluding that Plaintiff was not entitled to a "name clearing" and/or Codd hearing from both the USAO and the SEC?

(3)    Did the district court's allowance of judicial immunity violate the holding of Harper v. Merckle, 638 F.2d 848 (5th Cir. 1981), a binding precedent within the Eleventh Circuit?

---

[3] This brief shall refer to Plaintiff-Appellant Jonathan Mullane as "Plaintiff." The natural person Defendants-Appellees (viz. Federico A. Moreno, Alison W. Lehr, Lisa T. Roberts, Benjamin G. Greenberg, and Defendants Does 1 through 10) shall be referred to collectively as "Defendants." Finally, the substituted Westfall Act defendant, viz. Appellee United States of America, shall be referred to simply as "the United States."

(4)    Did the district court err in granting judicial immunity for "prosecutorial acts" which are not normally performed by a judge, or does a "circuit split" now exist?

(5)    Was it error to bestow judicial immunity for a criminal contempt hearing which was not within the Defendant judge's subject-matter jurisdiction in the first place?

(6)    Was it error for the district court to grant judicial immunity for all of the tortious acts relating to the Defendant judge's interference with Plaintiff's employment agreements, and where the Defendant judge lacked subject-matter jurisdiction over Plaintiff's federal employment?

(7)    Does the district court's allowance of qualified immunity give rise to reversible error?

(8)    Where Defendants, federal employees, deliberately "leaked" defamatory and highly-stigmatizing information to national news media, did the district court's allowance of FTCA substitution under the Westfall Act violate the binding Eleventh Circuit precedent of Nadler v. Mann, 951 F.2d 301 (11th Cir. 1992)?

(9)    Did the district court err in relying upon the judgment of another district court which was "null and void" for want of procedural due process as a matter of law under Supreme Court precedents?

3

(10)  By holding that RICO's *open*-ended continuity requirements are not satisfied in this action, did the district court below violate the Supreme Court's "continuity plus relationship" test?

(11)  In holding that RICO's *closed*-ended continuity requirements are not satisfied, did the district court below commit reversible error by failing to take the factual allegations of the complaint as true insofar as they relate to those particular requirements?

(12)  On the civil RICO conspiracy count, did the district court err in failing to consider that a reasonable jury may infer, at the time of trial, that each Defendant "agreed to the overall objective of the conspiracy"?

(13)  Did the district court below err in dismissing the fictitious-party "John Doe" defendants at the pre-discovery Rule 12 stage, or does a "circuit split" now exist between the Eleventh Circuit and the Fifth Circuit?

## <u>STATEMENT OF THE CASE</u>

### I.    <u>Statement of the Facts.</u>

The factual allegations are set forth in Plaintiff's Verified Second Amended Complaint ("SAC"), which is the operative complaint in this case. <u>See</u> <u>generally</u> D.E. 45. In early 2018, Plaintiff was employed as a law clerk intern in the Asset Forfeiture Division of the Miami office of the United States Attorney's Office for

the Southern District of Florida ("Miami USAO"), and had just signed a future employment agreement with the United States Securities and Exchange Commission ("SEC"). Based on his academic background and prior work experience in finance, Plaintiff was assigned to work in the Asset Forfeiture Division of the Miami USAO.

*Inter alia*, after Plaintiff complained of misconduct within the Miami USAO, both the USAO and the SEC terminated his employment agreements with each respective agency. In connection with this termination, Defendants proceeded to intentionally and maliciously "leak" stigmatizing and factually-false information to national news media. As a result of the foregoing, Plaintiff was subsequently denied admittance to the bar and has been unemployed since May 2019.

## II.    <u>Standard of Review.</u>

This appeal presents questions of law, which this Court reviews *de novo*. <u>See</u> <u>Sarabia-Arredondo v. United States AG,</u> 853 F. App'x 511,512 (11th Cir. 2021).

## <u>SUMMARY OF THE ARGUMENT</u>

This appeal presents inexorably-intertwined questions of both fact and of law. Plaintiff's theory of the case is straightforward, and can be succinctly summarized as follows: Plaintiff's ongoing USAO employment dispute, which was *already* ongoing by the time the April 10, 2018 hearing was even scheduled, together with the hearing itself and the related events which transpired thereafter, were not mere

"coincidences." In Plaintiff's view, each and every one of these related occurrences and events were part and parcel to the exact same, underlying USAO employment dispute that had started weeks before that April 10, 2018 hearing.

The district court below disagreed with Plaintiff's allegations—something which it was certainly entitled to do. But then, it took that a step further: it thereupon proceeded to apply the applicable law in this case to *its own*, subjective understanding of the "facts"—not to Plaintiff's own version of events as alleged in the operative complaint. However, if district courts are not even permitted to make their own factual determinations at the summary-judgment stage, they certainly cannot do so here at the pre-discovery, Rule 12 stage. And therein lies the problem with this particular appeal. Applying the district court's own "facts" to the relevant law in this matter, it may very well be the case that the district court was, in fact, *correct* in dismissing this action.

Thus, in addition to raising the garden-variety disputes about how the applicable law should be interpreted, and whether the district court below "got it right" when it analyzed, interpreted, and applied the applicable law, both Appellant and this Court are now unfortunately obligated to parse out the following:

(1)     Whether the district court did, in fact, correctly interpret the applicable law for each and every one of the legal arguments and/or justifications it relied upon in favor of dismissal; and

(2)    Even where the district court *did*, in fact, correctly interpret the relevant

law, whether that particular legal analysis made the district court was

based solely on Plaintiff's own factual allegations (as opposed to the

district court's substituted set of "facts," *i.e.*, what the district court sub-

jectively believes to have actually occurred during the events in ques-

tion).[4]

---

[4] The district court's unease vis-à-vis the asserted <u>Bivens</u> claims against Defendants in their *individual* capacities—including the individual-capacity claims against Defendant Moreno—are not easily understood by the undersigned. This is because, in practice, the notion of "individual capacity" liability for federal employees has unfortunately proven to be a legal fiction. Public records demonstrate that, in reality, "the federal government effectively [holds] its officers harmless in over 95% of the successful cases brought against them, and [pays] well over 99% of the compensation received by plaintiffs in [<u>Bivens</u>] cases." Pfander, J.E., *et al*., "THE MYTH OF PERSONAL LIABILITY," 72 Stan. L. Rev. 561, 566 (2020). Even worse, any monetary settlement or judgment would not even come out of the DOJ's or SEC's agency budgets; instead, funds paid to a successful <u>Bivens</u> plaintiff come out of the so-called "Judgment Fund" of the United States Treasury. <u>See</u> 31 U.S.C. § 1304 (2018) (appropriating money "to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law"); <u>see also</u> Figley, P.F., "THE JUDGMENT FUND: AMERICA'S DEEPEST POCKET & ITS SUSCEPTIBILITY TO EXECUTIVE BRANCH MISUSE," 18 U. Pa. J. Const. L. 145,147,158-64 (2015).

## **ARGUMENTS**

I.    THE DISTRICT COURT'S DECISION TO MAKE ITS OWN FACTUAL
     DETERMINATIONS AT THE RULE 12 STAGE OF THE PROCEEDING,
     WHERE NO DISCOVERY WAS ALLOWED AND NO EVIDENTIARY
     HEARING WAS HELD—AND TO THEREUPON DISMISS THIS
     ACTION "WITH PREJUDICE"—GIVES RISE TO REVERSIBLE
     ERROR.

At the Rule 12 stage, the district court was required by law to take the well-pleaded allegations of the complaint as true, and to *assume* that the confrontation between Plaintiff and Defendant Moreno "centered" around Plaintiff's then-ongoing USAO employment dispute, as opposed to the <u>Barclays</u> credit card case—full stop. Indeed, as this Court will note, not only do the two (2) appealed orders of the district court below curiously fail to credit this particular allegation, the said orders omit it entirely. This is particularly disheartening in light of the fact that the parties hereto are all in agreement that Plaintiff's USAO employment dispute began weeks prior to the April 10, 2018 hearing—something which is even confirmed in writing. In point of fact, Plaintiff's written USAO complaints were all dated multiple **weeks** before the April 10, 2018 hearing wherein Defendant Moreno falsely accused Plaintiff of misconduct, and *pre-dated* the alleged "misconduct" in the <u>Barclays</u> credit card dispute. The precise dates of these email communications are crucial to understanding the facts of the case *sub judice*.

Moreover, the said allegations of the operative complaint are entirely antithetical to all of the unauthorized factual findings made by the district court at the Rule

12 stage of the proceeding. These unauthorized factual determinations include, without limitation, all of the following:

> "Mullane contends that the defendants have fraudulently suppressed the identities of Does 1-10 . . . [b]ut the exhibits Mullane attaches to his brief do not support his contentions[,]" D.E. 7, n.4;
>
> "[Judge Moreno's] statements *centered* around Mullane's civil case pending before [him] and Mullane's actions to prosecute the case[,]" id. at 11 ¶ 2;
>
> "Judge Moreno [only] called Mullane to notify him of the hearing because Mullane, a *pro se* plaintiff, did not receive automatic email notices from the court[,]" id. at 12 ¶ 2;
>
> "[T]he call. . . involve[ed] a hearing in a matter over which [Moreno] had jurisdiction[,] id.;
>
> "Judge Moreno's alleged request to Lehr related *directly* to his decision on a motion pending before him, and <u>the nature and function of the request amounted to *seeking information* to rule on his motion</u>[,] id. at 13;
>
> "<u>And Judge Moreno was *rightly concerned* about a statement Mullane made in a pleading</u> regarding his attire that was *flatly contradicted* by the court's surveillance video[,] id. at 15;
>
> "<u>Such a 'blatant misstatement' *warrants action* from the court</u>, and if Mullane was [*sic*] a lawyer, the report may well have been to the state bar[,] id.;
>
> "Judge Moreno's <u>only</u> option was to send the information to Mullane's law school for it "to decide if any other action is necessary[,]" id.;
>
> "Critically, Judge Moreno copied Mullane on the letter, thereby giving Mullane an *opportunity to relay his position* and to challenge Judge Moreno's contention[,]" id.;
>
> "[R]eporting evidence of a violation of the rules of professional conduct or matters that concern the integrity of the judicial system is a normal judicial function and the content of the letter arose from a case Judge Moreno presided over and Mullane's visit to the judge in his official capacity[,]" id.;
>
> "Mullane does not plead that any defendant prevented him 'by force, intimidation, or threat [] from accepting or holding any office, trust, or place of confidence under the United States, *see* 42 U.S.C. § 1985(1)[,]" id. at 18 ¶ 1;

9

"Mullane also contends, without any factual support, that defendants violated his 'right to petition the judiciary for redress' and his 'right to legal counsel in all criminal matters[,]'" <u>id.</u> at 20 ¶ 2;

"Mullane does not dispute the defendants' contention that they were acting within their discretionary authority when the alleged acts occurred[,] <u>id.</u> at 20 n.16;[5]

"In addition, Mullane has not alleged that any defendant compelled him to make incriminating statements at the April hearing[,]" <u>id.</u> at 23;

"<u>Here, however, the allegedly stigmatizing remarks and actions were <i>not</i> made or taken in the course of a discharge,[6] demotion, or failure to rehire</u>[,]" <u>id.</u> at 29;

"However, the hearing transcript that Mullane attached to his second amended complaint . . . <i>contradicts</i> his belated contention about the purpose of his visit, and when a plaintiff's allegations contradict the content of an exhibit to the complaint, 'the exhibit controls,'" D.E. 104 at 2-3; and

"Indeed, the transcript reflects that Mullane visited Judge Moreno's chambers on the day in question because Mullane had questions about

---

[5] To the contrary, Plaintiff has repeatedly noted that no Defendant herein had any legal "authority" <i>at all</i> to investigate misconduct, regardless of whether or not the alleged misconduct actually occurred. Thus, the issue here is <u>not</u> whether Defendants' acts were "discretionary;" instead, the issue is whether they had any colorable "authority" <i>in the first place</i> (let alone "<i>discretionary</i> authority"). Indeed, Defendants were never employed by OIG, OPR, or the FBI; thus, they were necessarily acting <i>ultra vires</i> and in the clear absence of "authority" at all times relevant hereto. No Defendant in this case was hired by the United States, or any of its agencies, to perform **investigations** of their subordinates and colleagues (or even <i>non</i>-employees, for that matter). Unfortunately, the district court below appears to have inadvertently misapprehended the job description and function of prosecutors within the USAO and SEC. AUSAs are not FBI agents.

[6] <i>Inter alia</i>, this conclusion of the district court below is antithetical to the well-pleaded averments of the operative complaint, and is therefore is improper at the Rule 12 stage. The district court's determination that the tortious conduct complaint of here was somehow <i>not</i> related to the two (2) separate "discharges" from USAO and SEC employment are not easily understood by the undersigned. And more to the point, it is for the jury to decide whether these "coincidences" were, or were not, factually related to Plaintiff's two discharges.

10

the entry of default and a mandamus petition and due to his *confusion* about the different clerks in the courthouse[,]" <u>id.</u> at 3 ¶ 1.

For reasons which remain unclear, the district court arrived at all of the foregoing factual conclusions: (i) *sua sponte*, and at the Rule 12 stage; (ii) without granting discovery; (iii) without holding any evidentiary hearing; (iv) without holding any other type hearing, oral argument, or status conference in this case; and (v) while declining to grant Plaintiff's timely-submitted motion for limited scope-of-employment discovery. As further explained herein, the district court's findings of fact at the pre-discovery, Rule 12 stage constitute reversible error. At the motion-to-dismiss stage, the district court had a legal obligation to take all of the complaint's factual averments as being true—something which it unfortunately declined to do in this particular instance.[7]

Further, and notwithstanding the district court's misplaced holding to the contrary, there is nothing remotely unethical, improper, or unusual about an *ex parte* administrative request asking a clerk for a certified copy of the record; there is no

---

[7] To be sure, the district court did acknowledge that it was legally obligated to take all of Plaintiff's allegations as being true and factually correct. However, upon reading the two (2) appealed decisions in their entirety, it is unfortunately "crystal clear" and beyond reasonable dispute that it proceeded to do the exact opposite. To see why, this Court need only compare two documents in this case: (1) the operative complaint, which contains Plaintiff's factual averments; and (2) the district court's antithetical "facts" as set forth and recited in its memorandum opinion and order allowing Defendants' Rule 12 motion to dismiss—all of which are the polar opposite of the allegations contained in the complaint.

"wiggle room" for Defendants on this particular issue. <u>See</u> Canon 3(4)(b), CODE OF

CONDUCT FOR UNITED STATES JUDGES (effective Mar. 12, 2019), (clarifying that

*ex parte* communications are permissible when they are for "scheduling, adminis-

trative, or emergency purposes"); <u>accord</u> ABA Code of Judicial Conduct, Rule

2.9(A)(1) ("When circumstances require it, *ex parte* communication for scheduling,

*administrative*, or emergency purposes, which does not address substantive matters,

is permitted"); <u>Dragash v. Saucier</u>, 2017 U.S. App. LEXIS 23183 (11th Cir. Sep. 26,

2017) (*ex parte* communication with courtroom deputy was not improper because it

did not "give one party a procedural, substantive, or tactical advantage"); <u>Eleanora</u>

<u>J. Dietlein Tr. v. Am. Home Mortg. Inv. Corp.</u>, 2014 U.S. Dist. LEXIS 29576 at *6

(D. Nev. Mar. 7, 2014)("Mr. Wilson clearly intended to speak with court staff to

inquire about the status of a pending case, but the judge answered the call instead,

as chambers staff had left for the afternoon. Mr. Wilson's phone call was purely for

*administrative* purposes[.]"); <u>Liberty Mut. Ins. Co. v. Commer. Concrete Sys., LLC</u>,

2017 U.S. Dist. LEXIS 50786 at *3-4 (N.D. Fla. Apr. 1, 2017) (Walker, C.J.) (same);

<u>Manago v. Davey</u>, 2018 U.S. Dist. LEXIS 216320 at *12-13 (E.D. Cal. Dec. 21,

2018)(*ex parte* communications with the presiding judge regarding the feasibility of

a settlement conference were proper because they were for "administrative pur-

poses;" such communications did not constitute a "substantive discussion" of the

merits of the case pending before the judge); <u>El Omari v. Ras Al Khaimah Free Trade</u>

12

Zone Auth., 2017 U.S. Dist. LEXIS 68371 at *9-10 (S.D.N.Y. 2017) ("The [*ex parte*] communication the Court received from TAG's counsel did not address a substantive matter, but simply, as Sestack conveyed, TAG's inadvertent public filing of a document that TAG requested be filed under seal."); In re Sch. Asbestos Litig., 977 F.2d 764,789 (3d Cir. 1992) (*ex parte* communications are permitted when "related to non-merits issues").

And ironically, here, it was Defendant Moreno himself who engaged in numerous *ex parte* communication when he: (i) personally called Plaintiff's personal cell phone while the Barclays case was still pending, and prior to the April 10, 2018 hearing; (ii) engaged in *ex parte* telephone calls with the Miami USAO, *i.e.*, Plaintiff's employer, in order to discuss the case while it was still pending before Moreno[8]; and (iii) contacted Plaintiff's law-school professors[9] via telephone[10] and

---

[8] But see Commentary to Canon 3A(4), CODE OF CONDUCT FOR UNITED STATES JUDGES (effective Mar. 12, 2019) ("The restriction on *ex parte* communications concerning a proceeding includes communications from *lawyers, law teachers, and others who are not participants in the proceeding*.")

[9] See n.19, *supra.*

[10] In its Memorandum Opinion, the district court erroneously concluded that the exhibits appended to Plaintiff's complaint "failed to provide any factual support" for Plaintiff's allegations. However, since numerous communications were made by Defendant Moreno via telephone, those communications could not possibly have been provided in any "exhibits." And more to the point, at the pre-discovery Rule 12 stage, Plaintiff was never obligated to attach any transcripts and/or minutes of those telephone calls to his complaint. As reflected in the docket sheet, Plaintiff has yet to be afforded any discovery whatsoever in this proceeding.

in writing. Such abnormal behavior further demonstrates why the "confrontation" between Plaintiff and Defendant Moreno was highly personal in nature, and squarely "centered" around Plaintiff's USAO employment. Stated differently, the confrontation between Plaintiff and Defendant Moreno was <u>not</u> related to Moreno's official duties and responsibilities as a judge: to adjudicate and resolve disputes between the parties to the <u>Barclays</u> credit card case. Of course, it is undisputed by the parties that Defendant Moreno did not have any colorable subject-matter jurisdiction over Plaintiff's USAO employment.

II.    UNDER <u>CODD v. VELGER</u>, 429 U.S. 624 (1977) AND <u>JOHNSTON v. BORDERS</u>, 724 FED. APP'X 762 (11TH CIR. FEB. 9, 2018), THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFF WAS NOT ENTITLED TO A "NAME CLEARING" AND/OR <u>CODD</u> HEARING FROM *BOTH* THE MIAMI USAO AND THE SEC.

The holding of <u>Johnston v. Borders</u>, 724 Fed. App'x 762 (11th Cir. Feb. 9, 2018) (Carnes, C.J.) is instructive. In <u>Johnston</u>, *supra*, the plaintiff, an employee at a government-owned animal shelter, was fired after members of the public complained to her employer that she was euthanizing perfectly-healthy puppies at the shelter. 724 Fed. App'x at 764. The government employer fired the plaintiff immediately, and subsequently released three press statements in response to the public outcry. <u>Id.</u> at 764-65. Just as in the case at bar, in <u>Johnston</u>, the plaintiff's career was completely ruined by those press releases; media across the United States began reporting on this story, and published the plaintiff's photograph. <u>Id.</u> at 765. After the

14

plaintiff was fired, she mailed a letter to the (now former) government employer, expressly denying the statements made in the press releases; but instead of responding to that letter, the government employer maliciously forwarded it to the media. Id.  In response, the plaintiff brought an action against the government employer under 42 U.S.C. § 1983 and state defamation law, alleging that the government employer "violated her procedural due process rights by publishing false and stigmatizing statements in connection with her termination without giving her an opportunity to clear her name." Id. Following discovery, the court dismissed the action on summary judgment. Id.

On appeal, the Eleventh Circuit noted the elements of the plaintiff's due process claim:

> Johnston's § 1983 claim alleges a liberty interest deprivation. That claim is actionable if: (1) Sheriff Borders deprived Johnston of a liberty interest; and (2) adequate state remedies were not available to cure the deprivation. Zinermon v. Burch, 494 U.S. 113,125-26 (1990). **Due process requires public employers who publish stigmatizing information about an employee "to provide the opportunity for a post-termination name-clearing hearing" and to give "[n]otice of the right to such a hearing."** Buxton, 871 F.2d at 1042-43. To establish that Sheriff Borders deprived her of a liberty interest, Johnston must prove: "(1) a false statement (2) of a stigmatizing nature (3) attending [her] discharge (4) made public (5) by [her] government employer (6) without a meaningful opportunity for employee name clearing." Id. . . . **Construing the evidence in Johnston's favor, id. at 1040, several statements in the press releases are false and are stigmatizing.**

15

Id. at 766. Holding that the plaintiff had, in fact, introduced sufficient evidence to create a genuine dispute of material fact as to whether the government defendant had deprived her of a liberty interest, Chief Judge Carnes elucidated in pertinent part:

> The record evidence also creates a genuine dispute as to whether Johnston had a meaningful opportunity to clear her name. **Johnston testified that Sheriff Borders never notified her of her right to a name clearing hearing**, and Sheriff Borders admitted that he did not know what a name clearing hearing was. **Although Sheriff Borders argues that the Sheriff's Office gave Johnston an opportunity to clear her name by releasing her complaint letter in response to a media request, that disclosure was not a "meaningful opportunity for employee name clearing."** Id. **at 1042-43.** Johnston had no opportunity to *cross-examine adverse witnesses or rebut their claims*. See Campbell v. Pierce County, 741 F.2d 1342, 1345 (11th Cir. 1984). For those reasons, Johnston introduced sufficient evidence to create a genuine dispute of material fact as to whether Sheriff Borders deprived her of a liberty interest . . . . **The deprivation animating Johnston's claim is not a lack of notice; it is the _reputational_ harm she suffered without recourse.** See Buxton, 871 F.2d at 1046. Giving notice was part of Sheriff Borders' duty to give Johnston a meaningful opportunity to clear her name, not an independent liberty interest. See id. As a result, **an adequate remedy must do more than cure the lack of notice — it must give Johnston a chance to clear her name.**

Id. at 765, 767.

Finally, and perhaps most importantly, Chief Judge Carnes thereupon concluded that the government defendant employer was not entitled to qualified immunity, and that the countless published Eleventh Amendments decisions vis-à-vis "name clearing" hearings had given the government employer "fair warning" that his conduct was unconstitutional:

Several of our *published* decisions gave Sheriff Borders "fair warning" that his conduct was unconstitutional. We have held that government employees are entitled to a meaningful opportunity for a name clearing hearing after an employer places allegedly false and stigmatizing information in their personnel files. See Cotton, 216 F.3d at 1330; Buxton, 871 F.2d at 1038, 1045-46. Sheriff Borders did more than that — he publicly blamed Johnston for needlessly euthanizing over 100 animals in a series of press releases <u>without giving her an opportunity to clear her name. As a result, Sheriff Borders is not entitled to qualified immunity.</u>

Id. at 768. And as the Supreme Court of the United States has consistently stated,

qualified immunity cannot be used to protect "those who *knowingly* violate the law."

Hunter v. Bryant, 502 U.S. 224,227 (1991).[11]

III.    THE DISTRICT COURT'S ALLOWANCE OF JUDICIAL IMMUNITY VIOLATES THE HOLDING OF <u>HARPER v. MERCKLE</u>, 638 F.2d 848 (5TH CIR. 1981) (HILL, J.), A BINDING PRECEDENT WITHIN THE ELEVENTH CIRCUIT.

To determine whether something can even be considered a  "judicial act" in

the first place, the four-prong test used in the Eleventh Circuit is whether: "(1) the

precise act complained of . . . is a *normal* judicial function; (2) the events involved

occurred in the judge's chambers; (3) the controversy *centered* around a case then

---

[11] Also relevant here is the holding of <u>Doe v. U.S. Dep't of Justice</u>, 753 F.2d 1092, 1106-97 (D.C. Cir. 1985) (discharge of a DOJ employee without providing her due process and a hearing was actionable; "[E]ven if the discharge itself deprives the employee of no property interest protected by the [F]ifth or [F]ourteenth [A]mendments[,]" plaintiff was nevertheless entitled to assert a claim because "it is the individual's status as a government employee and not [her] property interest in continued employment which furnishes the 'plus' that raises reputation to the level of a constitutionally protected liberty interest.").

pending before the judge; and (4) the confrontation arose directly and immediately

out of a visit to the judge in his official capacity." Harper v. Merckle, 638 F.2d 848,

858 (5th Cir. 1981)[12] (quoting McAlester v. Brown, 469 F.2d 1280,1282 (5th Cir.

1972)) (defendant judge's decision to hold the plaintiff in contempt was not shielded

by judicial immunity due to the fact that the controversy between the plaintiff and

the judge "*centered*" around a personal dispute between the two, as opposed to any

court case that the judge may have been presiding over; thus, judicial immunity was

barred because the judge's finding of contempt against the plaintiff was not a "judi-

cial act" in the first place).

Harper, *supra*, is illustrative and directly on point. In Harper, the defendant

judge held a "'contempt hearing' of sorts," during which he "acted as a complaining

---

[12] Accord Harris v. Harvey, 605 F.2d 330 (7th Cir. 1979) (**divulgences to the press regarding events which had occurred at a court hearing, as well as charges that would be brought against the plaintiff as a result, were not "judicial acts" in the first place**); Ellis v. Thornsbury, 2016 U.S. Dist. LEXIS 69877 (S.D. W. Va. May 27, 2016) (denying defendant judge absolute immunity because an alleged extra-judicial conspiracy to defame the plaintiff, if true, is not a "judicial act" in the first place); Goldhaber v. Higgins, 2009 U.S. Dist. LEXIS 16648 (W.D. Pa. Mar. 3, 2009) (an alleged extra-judicial agreement and conspiracy to harm the plaintiff, if true, could not qualify as a "judicial act;" absolute immunity was therefore barred); Giron v. Chaparro, 2004 U.S. Dist. LEXIS 35375, at *7 (D.N.M. Dec. 8, 2004) ("[T]he fact that the final interaction between Plaintiff and Defendant began in a courtroom, during or after proceedings in front of the judge, does not mandate a finding that Defendant's actions were *judicial acts*. A judge may not use her power of contempt to punish an employee, as a result of a dispute over that employee's performance of her duties, and then obtain immunity simply because the employee's duties involved the courtroom process.").

witness, prosecutor, factfinder, and judge[.]" Id. at 852. On appeal, the Fifth Circuit concluded that the defendant judge's tortious acts were not *de jure* "judicial acts" in the first place, and therefore could not be shielded by absolute immunity. Id.; accord Lopez v. Vanderwater, 620 F.2d 1229 (7th Cir. 1980) (explaining that, because prosecutorial acts were not *normally* performed by a judge, they were not "judicial acts" that were protected by judicial immunity).

Here, taking the averments of the operative complaint as true, the controversy between Plaintiff and Defendants (including Defendant Moreno) began *weeks* before the April 10, 2018 hearing, and it plainly "centered" around his USAO employment. The subsequent hearing—which was not coincidental—was simply part and parcel of that same, ongoing employment dispute. And at the Rule 12 stage, the district court was legally obligated to take those well-pleaded allegations as true. Therefore, because the controversy between Plaintiff and Defendant Moreno "centered" around Plaintiff's USAO employment, and because the controversy arose long before the April 10, 2018 hearing, Moreno cannot satisfy Prong Nos. 3 and 4 of the Harper test. *A fortiori*, Prong No. 1 cannot possibly be satisfied either; this is because it is black-letter law that acting "as a complaining witness, prosecutor, factfinder, and judge" is not a "*normal*" judicial function.

With respect to Defendant Moreno's tortious conduct which took place during and after his recusal, none of those acts constitute "judicial acts" because he acted

in the "clear absence of subject-matter jurisdiction." For instance, the gratuitous defamatory allegations contained in Moreno's order of recusal were made in the absence of subject-matter jurisdiction. This is because, once a judge becomes aware of the fact that recusal is necessary, "that judge [can] take no further action in the case[] except to transfer the matter to another federal judge." Tramonte v. Chrysler Corp., 136 F.3d 1025,1028 (5th Cir. 1998). Indeed, "[i]f a court grants relief, which under the circumstances it hasn't any authority to grant, its judgment is to that extent void." 1 Freeman on Judgments § 120; cf. Gregory v. Thompson, 500 F.2d 59,63 (9th Cir. 1974) (when a judge acts in a capacity in which he is no longer authorized to exercise judicial or quasi-judicial discretion, he is not entitled to absolute judicial immunity).

In the case at bar, many—but not all—of Defendant Moreno's acts occurred after he became aware of the fact that recusal was necessary, and *after* he had formally entered his order of recusal. For instance, at the precise moment in time when Moreno mailed the defamatory letters to the University of Miami, he had *already* formally recused himself from the Barclays case. Thus, at that precise moment in time, he was acting as a private citizen. He was not engaging in any "judicial acts," and for the simple reason that he was acting without subject-matter jurisdiction. And

Defendant Moreno was fully aware of this, given that Moreno himself personally signed the order of recusal beforehand.[13]

IV.     THE DISTRICT COURT ERRED IN GRANTING JUDICIAL IMMUNITY FOR "PROSECUTORIAL ACTS" WHICH ARE NOT NORMALLY PERFORMED BY A JUDGE; THIS COURT SHOULD AVOID A CIRCUIT SPLIT WITH THE THIRD, SIXTH, AND SEVENTH CIRCUITS.

It is beyond reasonable dispute that no Article III judge is hired to perform other functions which are typically performed by *prosecutors* as opposed to judges themselves. Lopez v. Vanderwater, 620 F.2d 1229 (7th Cir. 1980) (explaining that, because prosecutorial acts were not normally performed by a judge, they did not constitute "judicial acts" in the first place; thus, the defendant judge was not entitled to judicial immunity); Wilson v. Rackmill, 878 F.2d 772,776 (3d Cir. 1989) (denying judicial immunity because the conduct complained of was "*investigative*" in nature as opposed to "adjudicatory"); Washington v. Rivera, 939 F.3d 1239,1244 (11th Cir. 2019) (citing to the Third Circuit's decision in Rackmill, *supra*, with approval); Wallace v. Powell, 2014 U.S. Dist. LEXIS 2908, at *38-39 (M.D. Pa. Jan. 9, 2014)

---

[13] Even if this Court were to hold that Defendant Moreno is entitled to absolute immunity for each and every tortious act which he committed: (1) *outside* the courtroom; and (2) *outside* of the April 10, 2018 hearing, that still would not justify dismissal of this action. This is because, in addition to seeking monetary damages, the operative complaint also requests declaratory relief; and both the Supreme Court of the United States and the Eleventh Circuit have already determined that judicial immunity can never bar declaratory relief. See, e.g., Pulliam v. Allen, 466 U.S. 522, 541-42 (1984); Tarver v. Reynolds, 808 F. App'x 752,754 (11th Cir. 2020).

(defendant judge's role in pressuring probation officers to change their recommendations is outside the role of a judicial officer, and not protected by judicial immunity); <u>Sevier v. Turner</u>, 742 F.2d 262 (6th Cir. 1984) (allowance of judicial immunity for the defendant judge was reversed because the **act of building up a case against someone, and thereupon initiating legal proceedings against him, are akin to the responsibilities of a prosecutor; such acts are not functions which are "normally performed by judicial officers"**).

In the case *sub judice*, the operative complaint alleges not one, but *multiple* acts undertaken by Defendant Moreno which were plainly "prosecutorial" in nature as opposed to "adjudicatory." These acts include, without limitation, seizing Plaintiff's employment records (and doing so without a warrant, in violation of Plaintiff's Fourth Amendment rights)—something which he obviously did not do *during* the April 10, 2018 hearing itself, or from the inside of a courtroom. Indeed, investigating and building up a case against someone is squarely "prosecutorial" in nature as opposed to "adjudicative." Therefore, were this Court to affirm the grant of judicial immunity for such "prosecutorial" acts, such a precedent would foreseeably create an undesirable and unnecessary circuit split with the Third, Sixth, and Seventh Circuits on this particular issue.

V.    IT WAS ERROR FOR THE DISTRICT COURT TO BESTOW
      JUDICIAL IMMUNITY FOR A CRIMINAL CONTEMPT HEARING
      WHICH WAS <u>NOT</u> WITHIN THE DEFENDANT JUDGE'S SUBJECT-
      MATTER JURISDICTION IN THE FIRST PLACE.

*Firstly*, a proceeding in criminal contempt is a separate and independent pro-

ceeding at law from the "main cause" (i.e., the <u>Barclays</u> case), with the United States

on one side and the defendant on the other. This is the exact opposite of proceedings

for civil contempt, which are typically between the original parties and are instituted

and tried as part of the main cause or as a supplemental proceeding thereto. <u>Bray v.</u>

<u>United States</u>, 423 U.S. 73 (1975); <u>Gompers v. Bucks Stove and Range Co.</u>, 221

U.S. 418,444-45 (1911). Thus, it was reversible error for the district court to con-

clude that, since Defendant Moreno did have subject-matter jurisdiction over the

<u>Barclays</u> civil credit card case, he must have had subject-matter jurisdiction over the

April 10, 2018 criminal contempt hearing too (he did not).

*Secondly*, Pursuant to the unambiguous, plain English meaning of Fed. R.

Crim. P. 42(a)(3) (*i.e.*, the applicable Rule that governs criminal contempt hearings

*even if* the alleged contempt occurs in the context of a civil case), where the contem-

nor is alleged to have shown any "disrespect toward or criticism of a judge, that

particular judge is *disqualified* from presiding [over the] hearing[.]" <u>Id.</u>; <u>see</u> <u>United</u>

<u>States v. Moncier</u>, 571 F.3d 593 (6th Cir. 2009) (criminal contempt proceeding re-

manded to be heard a different district court judge; the original judge had been

disqualified under Fed. R. Crim. P. 42(a)(3) because the alleged contempt involved "disrespect" towards the court)).

In the case at bar, there can be no *bona fide* dispute that the alleged contempt involved alleged "disrespect" towards the district court and towards Defendant Moreno. This is not the subjective opinion of the undersigned, but rather the recorded statement made by Moreno himself at the April 10, 2018 hearing. See, e.g., Tr. 8:13-15 ("MR. MULLANE: Your Honor, with all due respect -- / THE COURT: Skip the 'all due respect," because you have shown no respect[.]"). Thus, in accordance with the plain language of Fed. R. Crim. P. 42(a)(3), Defendant Moreno did not have any colorable subject-matter jurisdiction over the April 10, 2018 hearing *ab initio* due to the alleged "disrespect" towards the court (and the automatic, mandatory disqualification of the presiding judge in such instances).

*Thirdly*, it is black-letter law that a disqualified and/or recused judge is, by definition, acting without subject-matter jurisdiction and solely as a private citizen. This is because, once disqualification and/or recusal becomes necessary, "that judge [can] take no further action in the case[] except to transfer the matter to another federal judge." Tramonte v. Chrysler Corp., 136 F.3d 1025,1028 (5th Cir. 1998). Indeed, "[i]f a court grants relief, which under the circumstances it hasn't any authority to grant, its judgment is to that extent void." 1 Freeman on Judgments § 120. Here, the Barclays judge had already been *de jure* disqualified prior to the April 10,

2018 hearing. As previously noted, once the judge became aware of any alleged "disrespectful" conduct, he is deprived of subject-matter jurisdiction from that point in time onwards under the plain language of Fed. R. Crim. P. 42(a)(3). This particular Rule is clear and unambiguous, and does not require any creative legal exegesis. Cf. Gregory v. Thompson, 500 F.2d 59,63 (9th Cir. 1974) (once a judge continues to act in a capacity in which he is no longer authorized to exercise judicial or quasi-judicial discretion, he forfeits his right to absolute judicial immunity).

VI.   IT WAS ERROR FOR THE DISTRICT COURT TO GRANT JUDICIAL IMMUNITY FOR THE SPECIFIC TORTIOUS ACTS RELATING TO THE DEFENDANT JUDGE'S INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT AGREEMENTS, BECAUSE THE DEFENDANT JUDGE LACKED ANY COLORABLE SUBJECT-MATTER JURISDICTION OVER PLAINTIFF'S FEDERAL EMPLOYMENT.

Taking the well-pleaded averments of the complaint as true, there can be no *bona fide* dispute that the controversy between Plaintiff and Defendant Moreno—a dispute which was of a highly-personal nature—"centered" around Plaintiff's USAO employment. See, e.g., Tr. 4:21-25 (THE COURT: "It is your last week. *It will be your last week and you'll never be able to work at the U.S. Attorney's Office again*[.]"). As a matter of law, Plaintiff was entitled to have that particular allegation taken as true at the Rule 12 stage. But unfortunately, that is not how the district court below opted to proceed. Instead, the district court erroneously concluded—without any supporting facts of record—that the controversy actually "centered" around the Barclays credit card dispute instead, and even though the dispute between Plaintiff

25

and Moreno had absolutely nothing to do with Barclays Bank Delaware (*i.e.*, the opposing party). Nor did the dispute have any connection with Moreno's professional duties as a judge: to resolve disputes between adversaries. Unsurprisingly, Barclays Bank Delaware made no objection to Plaintiff's supposedly "flabbergast[ing]" and "outrageous" administrative request for a certified copy of the record—and why would it even care, given that it wasn't prejudiced in any way? In sum, because the entire controversy had no nexus with Barclays Bank Delaware or the <u>Barclays</u> credit score litigation, it is beyond reasonable dispute that it "centered" around a dispute of a highly-personal nature between Plaintiff and Moreno, and Plaintiff's USAO employment.

Had the district court opted to take the complaint's allegations as being true, and had the district court instead deemed the subject controversy to have been "centered" around Plaintiff's USAO employment (as it was obligated to do at the motion-to-dismiss stage), it cannot reasonably be disputed that Defendant Moreno was not acting with any colorable subject-matter jurisdiction over Plaintiff's USAO *employment* (*i.e.*, something which was obviously not at issue in the <u>Barclays</u> credit card case).

Were this Court to affirm the district court's misplaced holding, that would create a disturbing and undesirable precedent—and one which is unsupported by Eleventh Circuit precedents. *A fortiori*, it would create a precedent which is

26

antithetical to the underlying rationale of the common-law doctrine of judicial immunity, which exists solely to protect judges from litigation relating to their important role in our society: the role of adjudicating disputes *between adversaries* (*i.e.*, as opposed to adjudicating personal disputes involving the judge himself). Citing to this case, whenever a private citizen in this circuit has the misfortune of appearing before a judge with whom he or she is involved in an unrelated personal dispute, that particular judge could thereupon proceed to: (1) have the citizen's employer fire him; (2) send defamatory letters and make defamatory telephone calls to third parties; (3) contact bar associations to ensure that the private citizen will never receive a license to practice his profession; and (4) anything else that judge wishes to do. And then, once the private citizen brings an action against that judge seeking a modicum of relief, the judge could immediately claim judicial immunity merely because he had subject-matter jurisdiction over certain *unrelated* litigation that the plaintiff happened to be a party to—and even though the judge's tortious acts "centered" around the personal dispute between the two, <u>not</u> around the unrelated litigation he happened to be presiding over at the time.

VII.    THE DISTRICT COURT'S ALLOWANCE OF QUALIFIED
        IMMUNITY GIVES RISE TO REVERSIBLE ERROR IN LIGHT OF
        THE FACT THAT: (1) ALL OF THE TORTIOUS CONDUCT
        COMPLAINED OF HERE WAS *ULTRA VIRES*, AND NOT PART OF
        DEFENDANTS' RESPECTIVE JOB DESCRIPTIONS AND/OR
        PROFESSIONAL RESPONSIBILITIES IN THE FIRST PLACE; (2) THE
        FIRST, FOURTH, AND FIFTH-AMENDMENT RIGHTS IMPLICATED
        HERE WERE, AND STILL REMAIN, "CLEARLY ESTABLISHED"
        UNDER NUMEROUS ELEVENTH CIRCUIT CASE PRECEDENTS;
        AND (3) IN <u>HOPE v. PELZER</u>, 536 U.S. 730 (2002), THE SUPREME
        COURT REJECTED THE ELEVENTH CIRCUIT'S "MATERIALLY
        SIMILAR CASE" REQUIREMENT FOR PLAINTIFFS TO DEFEAT
        AND/OR OVERCOME A QUALIFIED IMMUNITY DEFENSE.

    (a)    <u>Conduct which is *ultra vires*, and not part of the federal employ-
           ees' job responsibilities *in the first place*, is not eligible for quali-
           fied immunity; it was error for the district court to place the burden
           of proof on Plaintiff, requiring him to prove that Defendants were
           *not* acting within their respective job descriptions.</u>

As clarified in <u>Rodemaker v. Shumphard</u>, 2021 U.S. App. LEXIS 16986, at

*4 (11th Cir. 2021), in order for any district court to even *begin* conducting a "qual-

ified immunity" analysis, the government defendant—*i.e.*, not the plaintiff—must

*first* prove that he or she was "acting within his [or her] discretionary authority." <u>Id.</u>

Then, and only then, may the district court proceed to the next step of its qualified-

immunity analysis: whether a "clearly established" right has been violated. But here,

the district court below inadvertently skipped that mandatory first step, and pro-

ceeded directly to the "clearly established right" analysis (*i.e.*, the second step).

In the case at bar, the district court—without any supporting facts, without the

benefit of the requested limited scope-of-employment discovery, and without any

evidentiary hearing—mistakenly believed that Defendants had jurisdiction and/or "discretionary authority" over misconduct investigations too (they do not). However, because Defendants did not even make any *prima facie* showing that each and every alleged tortious act was part of their job description and/or professional duties in the first place, it follows that they additionally failed to "prove" that proposition. And that fact is dispositive in this appeal. Under Eleventh Circuit case precedents, a government defendant asking the court for qualified immunity must first "*prove*" that each of the alleged acts were part of his or her job description. See Rodemaker, *supra* at *4. Not only is the district court's finding *not* supported by anything of record[14] in this proceeding, in reality, it is unfortunately factually incorrect and contradicted by the Code of Federal Regulations and the Justice Manual (2018 ed.) of the USAO itself.

As the Court is aware, the United States Attorney's Office ("USAO") is a component of the United States Department of Justice ("DOJ"). Within the DOJ, there are not one, but *two* specific offices that have jurisdiction over allegations of employee misconduct: the Office of the Inspector General ("OIG") and the Office

---

[14] Indeed, not even a simple declaration and/or affidavit was ever submitted by Defendants, let alone testimony and/or supporting documentation explaining what specific tasks each Defendant was hired to perform on behalf of the federal government. And without any facts of record relating to Defendants' respective job descriptions, the district court's grant of qualified immunity was premature.

of Professional Responsibility ("OPR"). Alternatively, the Federal Bureau of Investigation ("FBI") also has jurisdiction over any and all allegations of employee misconduct. But neither the Miami USAO nor its employees—including Defendants Greenberg and Lehr—have any legal "authority" to conduct any internal investigations in the first place (let alone "*discretionary* authority"), and the same applies to Defendant Roberts of the Miami SEC. In other words, Defendants' conduct was all *ultra vires* as a matter of law; these events were not "just another day at work" for these particular Defendants.

Indeed, both OIG and OPR are physically located in Washington, DC. But in the instant case, these Defendants all live and work in Miami, Florida. And not one of the Defendants in this lawsuit works for OIG, OPR, or the FBI. Accordingly, how or why any Defendant in this matter could possibly have been "acting within his [or her] discretionary authority" (let alone *proving* that erroneous proposition, as Defendants were required to do under Eleventh Circuit case precedents) is far from clear.[15]

---

[15] As previously explained, *ante*, Defendants bear the burden of proof here—not Plaintiff. Of course, as reflected by the docket sheet, there is not an iota of evidence relating to Defendants' individual job descriptions. Yet, according to the district court's June 29, 2021 Memorandum and Order [D.E. 78-79], even asset forfeiture attorneys such as Defendant Lehr—*i.e.*, persons with zero training and/or experience in conducting investigations of alleged misconduct—can act as HR administrators, FBI agents, OIG investigators, and OPR employees depending on the situation. In other words, according to the district court below [D.E. 78-79], both OIG and OPR are useless, redundant offices because, in practice, <u>any</u> federal employee can conduct

*Inter alia*, even assuming *arguendo* that Defendants' job description required them to transmit and mail a defamatory performance evaluation to the University of Miami and other third-parties outside of the agency—something which is far from clear, given that there are presently zero facts of record explaining what specific tasks Defendants were hired to do on behalf of the federal government—that is not what this lawsuit is about. Plaintiff respectfully invites this Court to review the actual "performance evaluation" which was transmitted by Defendants. Therein, Defendants maliciously defame Plaintiff by accusing him of misconduct in his personal credit score litigation (*i.e.*, the <u>Barclays</u> case)—something which was: (1) not related to his USAO employment, and his ability to perform his professional duties; and (2) obviously not related to his job "performance" within the USAO. Thus, the district court's holding that Defendants were somehow acting within the scope of their employment on behalf of the United States government by making defamatory statements about things Plaintiff allegedly did outside of the workplace (and which had nothing to do with his "job performance" in the first place, even if the allegation was true) is misplaced. Because Defendants have not "*proven*" that they were acting

---

an internal investigation of their own subordinates and colleagues. Even worse, according to the Memorandum Opinion, any federal employee (as opposed to OIG or OPR) can: make findings of fact regarding misconduct; administer the appropriate punishment; publish those findings to the national news media, *i.e.*, persons outside of the agency; and do all of the foregoing without ever affording the victim his or her due-process rights.

within their "discretionary authority"—and there are presently zero facts of record that even suggest that they were—then they have necessarily failed to satisfy the Eleventh Circuit's requirement that government defendants do so *before* seeking qualified immunity.

> (b)  <u>All of the First, Fourth, and Fifth-Amendment rights implicated in this case were, and still remain, "clearly established" within the Eleventh Circuit.</u>
>
> > (1)  <u>"Clearly established" First Amendment rights within the Eleventh Circuit.</u>

In 2016, citing specifically to <u>Lane v. Franks</u>, 573 U.S. 228 (2014), the Eleventh Circuit clarified that the mere fact that the public employee first learned of the matter of "public concern" within the workplace and/or in an employment context (just as Plaintiff did here), or that the employee's complaint pertained to something work-related, does not imply that, at the precise moment in time when the employee subsequently spoke out and complained about that matter of "public concern," he must have been complaining in his capacity as a public employee rather than a private citizen complaining about a matter of "public concern." <u>Carollo v. Boria</u>, 833 F.3d 1322, 1327 (11th Cir. 2016) (reversing, in part, district court's Rule 12 dismissal; plaintiff had pleaded a viable First Amendment retaliation claim because he spoke as a citizen and not pursuant to his ordinary job duties as City Manager when he complained about the mayor's and councilwoman's misconduct). Indeed, in <u>Carollo</u>, the Eleventh Circuit observed in pertinent part:

32

In <u>Lane v. Franks</u>, 573 U.S. 228 (2014), the Supreme Court clarified what it meant in <u>Garcetti</u> when it used the phrase "owes its existence to": [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. **The critical question under <u>Garcetti</u> is whether the speech at issue is itself ordinarily within the scope of an employee's duties, *not* whether it merely concerns those duties** . . . . <u>Id.</u> at 2379. We subsequently explained that "[a]fter <u>Lane</u>," <u>Garcetti</u>'s phrase "owes its existence to . . . must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." <u>Alves</u>, 804 F.3d at 1162.

(Emphasis supplied) <u>id.</u>; <u>cf.</u> <u>Anderson v. Valdez</u>, 845 F.3d 580 (5th Cir. 2016) (in a §1983 action alleging that the **defendant judge retaliated against the plaintiff in violation of the First Amendment** after he filed a judicial disciplinary complaint, the trial court properly denied defendant's motion to dismiss because plaintiff pleaded the violation of a "clearly established" right and qualified immunity did not apply to the defendant judge).

> (2) <u>"Clearly established" Fourth Amendment rights within the Eleventh Circuit.</u>

*First*, the district court's finding that Plaintiff somehow did not have a reasonable expectation of privacy vis-à-vis files on his personal laptop computer—merely because he consented to that Fourth Amendment "search and seizure" based upon deceptive statements made to him by Defendants—is squarely refuted by the voluminous Fourth Amendment case law on this issue. <u>See, e.g.</u>, <u>United States v. King</u>, 2006 U.S. Dist. LEXIS 86370, at *3 (M.D. Ala. 2006); <u>United States v. Tweel</u>, 550

F.2d 297,299 (5th Cir. 1977) ("[A] consent search is unreasonable under the Fourth Amendment if the consent was induced by the *deceit*, trickery or misrepresentation of the [federal employee.]"); <u>Pagán-González v. Moreno</u>, 919 F.3d 582 (1st Cir. 2019) (same).

*Second*, for this Court to affirm the district court's holding that Plaintiff's person was somehow <u>not</u> "seized" at the April 10, 2018 hearing (within the meaning of Fourth Amendment) that would entail rejecting the allegations of the operative complaint—something which it is impermissible and barred at the Rule 12 stage. As a matter of settled law, "an *initially* consensual encounter . . . can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" <u>I.N.S. v. Delgado</u>, 466 U.S. 210,215 (1984) (cleaned up) (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544,554 (1980)). Here, no reasonable person could possibly have believed that he was "free to leave" and walk out of the April 10, 2018 criminal contempt hearing before a federal judge; it makes no difference that Defendants used deception to initially persuade Plaintiff to "voluntarily" appear at the said hearing, and without legal counsel present. And even if Defendants disagree, ultimately, that presents a triable question of fact to be resolved by a jury of Plaintiff's peers.

(3) <u>"Clearly established" Fifth Amendment rights within the Eleventh Circuit.</u>

Defendants' assertion that Plaintiff was never entitled to a "name-clearing hearing" and/or <u>Codd</u> hearing from *both* the USAO and SEC because Defendants supposedly never published and/or transmitted any "stigmatizing information" about him to the University of Miami, *Law360*, *Above the Law*, and to countless other parties (both within and without the respective agencies) is misplaced. Naturally, that is the polar opposite of what has been alleged in the complaint,[16] and Judge Carnes' thoughtful opinion in <u>Johnston v. Borders</u>, 724 Fed. App'x 762 (11th Cir. Feb. 9, 2018) explains precisely why a government employer's deprivation of a "name-clearing hearing" in these exact circumstances constitutes an actionable due process violation. Furthermore, as Judge Carnes elucidated in <u>Borders</u>, *supra*, that Fifth Amendment constitutional right is "clearly established" within the Eleventh Circuit, and qualified immunity is barred here as a matter of settled law in this circuit.

---

[16] In a qualified immunity analysis, the district court must assume that the plaintiff's version of events—as alleged in his or her complaint—is factually true and accurate. But here, the district court—at the pre-discovery, Rule 12 stage no less—decided to conduct its qualified immunity analysis based upon *Defendants'* version of events. <u>Contra</u> <u>Apothecary Dev. Corp. v. City of Marco Island Fla.</u>, 517 F. App'x 890 (11th Cir. 2013) ("[D]ismissal of Plaintiffs' complaint based on qualified immunity grounds at the motion-to-dismiss stage is not appropriate in this case . . . Plaintiffs' complaint has sufficiently pleaded facts that, taken as true, violate Plaintiffs' clearly established substantive due process rights.").

(c)  <u>The district court's ruling that Plaintiff was required to locate and cite a factually-identical Eleventh Circuit case was misplaced; that requirement is no longer good law, and the Eleventh Circuit's "materially similar case" requirement was specifically rejected by the Supreme Court of the United States in <i>Hope</i> v. <i>Pelzer</i>, 536 U.S. 730 (2002).</u>

In allowing Defendants' request for qualified immunity, the district court below faulted Plaintiff for purportedly failing to find a "materially similar case" within the Eleventh Circuit—<i>i.e.</i>, a binding Eleventh Circuit precedent wherein the facts were "materially similar" to the atypical facts of the case <i>sub judice.</i> In so doing, the district court unfortunately committed reversible error due to the fact that the so-called "materially similar case" requirement is no longer good law. While that requirement did indeed exist within the Eleventh Circuit up until 2002, in <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002), the Supreme Court of the United States specifically <i>rejected</i> the use and imposition of the "materially similar case" requirement. <u>Id.</u> Accordingly, the district court's "with prejudice" dismissal of this action is due to be reversed and remanded for further proceedings.

VIII.  WHERE DEFENDANT FEDERAL EMPLOYEES DELIBERATELY "LEAKED" DEFAMATORY AND HIGHLY-STIGMATIZING INFORMATION TO NATIONAL MEDIA PUBLICATIONS, THE DISTRICT COURT'S ALLOWANCE OF WESTFALL ACT SUBSTITUTION VIOLATED THE BINDING ELEVENTH CIRCUIT PRECEDENT OF <u>NADLER v. MANN</u>, 951 F.2D 301 (11TH CIR. 1992).

The Eleventh Circuit's binding precedent in <u>Nadler v. Mann</u>, 951 F.2d 301 (11th Cir. 1992) directly applies to the instant case, and on "all fours." In <u>Nadler,</u>

36

*supra*, the plaintiff—a Florida state-court judge—alleged that an Assistant United States Attorney ("AUSA") within the Miami USAO leaked information to the *Miami Herald*, stating that the plaintiff "was the subject of a criminal investigation being conducted by the United States Government stemming from an allegation that the [plaintiff] had accepted a bribe[.]" Nadler, 951 F.2d at 303. Just as in the instant case, the United States Attorney for the Southern District of Florida signed a Westfall Act certificate on behalf of the defendant AUSA. Id. at 304. The district court thereupon substituted the United States as the defendant and then dismissed the entire action because, under the FTCA, the United States is immune from liability for all defamation claims. Id.

On appeal, the Eleventh Circuit reversed in part and remanded. Id. at 306. The Eleventh Circuit held that Westfall Act substitution was unavailable and barred due to the fact that an AUSA's act of "leaking" information about allegations of misconduct to the press is *not* within the scope of his or her federal employment. Id. Indeed, the Eleventh Circuit could not possibly have been any clearer on this point:

> Nadler charges also that Mann defamed and slandered him by leaking to the *Miami Herald* the story of the FBI's investigation into the public official's allegation regarding Nadler. **An AUSA does <u>not</u> act within the scope of his employment when he leaks information regarding a criminal investigation to the news media**. An AUSA who leaks information to the press simply is not "doing what his employment contemplated." Thus, we hold that **the district court erred in determining that Mann acted within the scope of his employment insofar as its determination relates to Mann's alleged leak to the *Miami Herald***.

Id. In so holding, the Eleventh Circuit reasoned that, while referring the allegations against the plaintiff to the FBI for investigation—*i.e.*, the component of the DOJ that is specifically tasked with conducting *investigations*—may have been "within the scope" of the defendant's federal employment, leaking those same allegations to the media was *not* "within the scope" of employment of an AUSA employed at the Miami USAO. Id. at 305-06.

The facts of Nadler are identical to the case at bar. Just as in Nadler, while Defendants herein certainly would have been acting within the scope of their federal employment had they reported Plaintiff to the FBI, OIG, or OPR, that is not what they did here. Instead, they relayed the allegations of criminal conduct to **third parties** such as: Defendant Moreno (who was not a USAO or DOJ employee); Defendant Roberts (same); the University of Miami; the Florida Bar; the Massachusetts Bar; the *Above the Law* national legal publication in New York City; and the *Law360* national legal publication. Even worse, Defendants herein went a step further by additionally leaking Plaintiff's employment records—something which is a *criminal* offense under federal law, not civil. 5 U.S.C. §552a(i).[17]

---

[17] This fact is dispositive in this appeal because, under Florida state law, an employee engaging in criminal conduct is not deemed to be acting within the scope of his or her employment. Iglesia Cristiana La Casa Del Senor, Inc. v. L.M., 783 So. 2d 353, 356 (Fla. 3d DCA 2001).

In the instant matter, the district court's allowance of Westfall Act substitution on the common-law claims also squarely contradicts other factually-analogous cases such as <u>Anderson v. United States</u>, 364 Fed. App'x 920 (5th Cir. 2010); <u>Armstrong v. Thompson</u>, 759 F. Supp. 2d 89 (D.D.C. 2011) (remanded on other grounds); and <u>Allstate Ins. Co. v. Quick</u>, 254 F. Supp. 2d 706 (S.D. Ohio 2002) (finding that defamatory statements were not "within the scope of employment," thereby barring substitution of the United States pursuant to the Westfall Act as the party defendant).

IX.    THE DISTRICT COURT ERRRED IN RELYING UPON THE JUDGMENT OF ANOTHER DISTRICT COURT WHICH WAS "NULL AND VOID" FOR WANT OF PROCEDURAL DUE PROCESS AS A MATTER OF LAW UNDER THE BINDING CASE PRECEDENTS OF THE SUPREME COURT OF THE UNITED STATES.

Under both Supreme Court and Eleventh Circuit case precedents, the April 10, 2018 hearing must be deemed to be a *criminal* contempt hearing as opposed to a hearing for *civil* contempt. <u>See</u> <u>Bush Ranch v. E.I. DuPont de Nemours & Co. (In re E.I. DuPont de Nemours & Co.-Benlate Litig.)</u>, 99 F.3d 363,368 (11th Cir. 1996) ("We have little trouble concluding that the sanctions the district court imposed were overwhelmingly punitive—and thus criminal—in nature"); <u>see</u> <u>also</u> <u>Blalock v. United States</u>, 844 F.2d 1546, 1560 n.20 (11th Cir. 1988) (per curiam) (Tjoflat, J., specially concurring) ("It requires no citation of authority to say that a district court may not, even unwittingly, employ a civil contempt proceeding to impose what, in law, amounts to a criminal contempt sanction . . . . When a district court employs

39

civil contempt procedures to punish a contemner [*sic*], it necessarily deprives the contemner of his constitutional rights and renders his contempt citation a nullity."); SEC v. Pension Fund of Am., L.C., 396 Fed. Appx. 577 (11th Cir. 2010) (per curiam) (same);[18] In re Troutt, 460 F.3d 887 (7th Cir. 2006) (where it was unclear what type of contempt and/or contempt hearing had occurred, court was required to err on the side of caution by affording the procedural and constitutional safeguards assured by Fed. R. Crim. P. 42(a)).[19, 20]

---

[18] The Eleventh Circuit's *per curiam* opinion in SEC, *supra*, provides an excellent overview of the applicable law on the use of criminal contempt hearings in the context of civil litigation, and is directly analogous.

[19] The importance of the meaningful distinctions between "criminal contempt" and "civil contempt" cannot be overstated. For instance, under federal common law, "**[c]riminal contempt is a crime in the ordinary sense**." Bloom v. Illinois, 391 U.S. 194, 201 (1968). More importantly, the constitutional protections for criminal contempt proceedings include, without limitation, the following rights: (1) not to be subject to double jeopardy, see United States v. Dixon, 509 U.S. 688,695 (1993); (2) to receive timely notice of the charges; (3) to receive assistance of counsel; (4) to receive summary process; (5) to present a defense, Cooke v. United States, 267 U.S. 515,537 (1925); (6) not to self-incriminate oneself; and (7) that the Government, as opposed to the presiding judge himself, prove the criminal contempt "beyond a reasonable doubt[,]" Gompers v. Bucks Stove & Range Co., 221 U.S. 418,444 (1911).

[20] Cf. Adams v. Ford Motor Co., 653 F.3d 299,305 (3d Cir. 2011) (concluding that district court's finding of lawyer misconduct—even if unaccompanied by a formal reprimand or monetary penalty—still constituted a *de jure* "sanction" because it "directly undermine[d] [the lawyer's] professional reputation and standing in the community").

In addition to the foregoing, even if the April 10, 2018 hearing had, in fact, been within the judge's subject-matter jurisdiction—and it was not—that is not the end of our analysis. This is because Defendant Moreno deliberately failed to inform Plaintiff of the nature and/or subject of the April 10, 2018 hearing beforehand, and failed to issue the required written contempt petition and/or show-cause order to give Plaintiff timely notice.[21] Even worse, Plaintiff was never informed of his right to counsel at or before that criminal contempt hearing.

But how do the myriad constitutional deficiencies present in the April 10, 2018 hearing impact the case at bar, *i.e.*, a separate proceeding? Those deficiencies are relevant and dispositive here because the district court below erroneously relied upon Defendant Moreno's "findings" in that separate case—all of which are null and void. This is because, under federal common law, all proceedings which fail to

---

[21] The contempt petition under Rule 42(b) must satisfy the basic requirements of "fair notice." United States v. United Mine Workers of America, 330 U.S. 258, 298-300 (1947). It must also set forth the specific "essential facts" constituting the criminal contempt charge contemplated. See, e.g., United States v. J. Myers Schine, 260 F.2d 552, 557 (2d Cir. 1958), cert. denied, 358 U.S. 934 (1959). The words "criminal contempt" need not be used in the petition or rule to show cause, but only so long as the contemnor realizes that a criminal contempt prosecution is contemplated. United States v. Joyce, 498 F.2d 592,595 (7th Cir. 1974). Fed. R. Crim. P. 42(b) requires that the notice allow a "reasonable time for the preparation of a defense." A "reasonable time" will vary according to the circumstances of each case, but in no event can the time be reduced below the minimum needed adequately to prepare a defense. United States v. Hutchinson, 633 F.2d 754 (9th Cir. 1980); In re Sadin, 509 F.2d 1252 (2d Cir. 1975).

comport with due process requirements are void *ab initio*. See, e.g., <u>Kessler v. Crichton</u>, 221 F.3d 1342,1342 (8th Cir. 2000) ("A judgment is void if the rendering court lacked jurisdiction *or* acted in a manner inconsistent with due process."); <u>Earle v. McVeigh</u>, 91 U.S. 403 (1875) (elucidating that judgments are not legally valid in the absence of constitutional protections, where a party was not provided timely "due process" notice).[22] And because "void" proceedings are *de jure* a legal nullity, the district court's reliance on those void proceedings in the separate <u>Barclays</u> proceeding gives rise to reversible error.

X.     BY CONCLUDING THAT RICO'S *OPEN*-ENDED CONTINUITY REQUIREMENTS ARE NOT SATISFIED IN THIS ACTION, THE DISTRICT COURT BELOW VIOLATED THE SUPREME COURT'S "CONTINUITY PLUS RELATIONSHIP" TEST.

For civil RICO purposes, "continuity" can be either a closed-ended or open-ended concept. <u>H. J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229,237 (1989). Open-ended continuity requires a showing of past conduct that "by its nature projects into the future with a threat of repetition." <u>Id.</u> at 241. Here, the allegations of the complaint

---

[22] In the district court below, Defendants argued that the proceedings in the <u>Barclays</u> case can only be adjudged "void" in that same proceeding. But Defendants are mistaken. This is because, under federal common law, proceedings which are alleged to be "void" can be attacked in any *other* proceeding in which the validity of that proceeding is challenged and/or called into question. See, e.g., <u>United States v. Holtzman</u>, 762 F.2d 720, 724 (9th Cir. 1985) (clarifying that **void judgments may *also* be challenged in any other proceeding in which the validity of the judgment is at issue**). Similarly, it is black-letter law that judgments which are alleged to be "void" may be challenged at any time; there is no time limit. <u>Rodd v. Region Constr. Co.</u>, 783 F.2d 89,91 (7th Cir. 1986).

could not be clearer: Defendants presently *continue* to actively engage in their un-

lawful conduct and scheme. And such allegations are more than sufficient to give

rise to open-ended continuity. This ongoing conduct includes, *inter alia*: actively

interfering with FOIA/PA requests submitted to both the USAO and SEC in order

to "cover up" past unlawful conduct; obstructing the administration of justice; and

criminally assaulting Plaintiff's process server. And these well-pleaded allega-

tions—when viewed as true—are *de jure* sufficient to satisfy open-ended continuity

for both the civil RICO and RICO conspiracy claims. Randall v. Offplan Millionaire

AG, 2020 U.S. Dist. LEXIS 83876 (M.D. Fla. Apr. 21, 2020) (defendants' ongoing

"cover up" of past conduct satisfies RICO's continuity requirement); Grunewald v.

United States, 353 U.S. 391,405 (1957) (clarifying that a "conspiracy" necessarily

includes, by definition, any agreement to "cover up" and/or conceal the defendants'

past unlawful conduct).

Further, the Supreme Court of the United States has unambiguously "left the

door open" for civil RICO cases involving a single scheme—even where the harm

is only inflicted on a single victim. Indeed, the Court has consistently held that civil

RICO claims are cognizable in cases such as this one where "multiple predicates

within a single scheme" are alleged; provided, however, "that [they] were related

and that amounted to, or threatened the likelihood of, continued criminal activity."

H. J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229,237 (1989). The Eleventh Circuit has

also determined that all "[a]cts that are part of the same scheme or transaction can qualify as distinct predicate acts[.]" <u>Bank of America v. Touche Ross & Co.</u>, 782 F.2d 966,971 (11th Cir. 1986). By way of example, under binding Eleventh Circuit case precedents, even a "single episode of bribery could be viewed by a jury as a scheme consisting of multiple violations, sufficiently interrelated and continuous to constitute a pattern of racketeering activity." <u>Cox v. Adm'r U.S. Steel & Carnegie</u>, 17 F.3d 1386,1397 (11th Cir. 1994), <u>modified on reh'g</u>, 30 F.3d 1347 (11th Cir. 1994). Here, the two (2) appealed orders do not appear to state, let alone explain, how each and every instance of tortious conduct in this case was an independent, unrelated, and isolated event. Taking the allegations of the complaint as true—something which was unfortunately not done in this particular instance—not one of Defendants' actions was a mere "coincidence."

To the contrary, the operative complaint conspicuously alleges that each and every event was part and parcel to Defendants' scheme to retaliate against him, and that each and every Defendant in this case acted in furtherance of that same *mala fide*, unlawful purpose—full stop. And while Defendants will predictably dispute that version of events (as they are certainly entitled to do), such a question of *fact* may only resolved by the factfinder at the time of trial. They cannot request a "trial by pleading" at the pre-discovery, Rule 12 stage instead. <u>Accord</u> <u>ADA v. Cigna Corp.</u>, 605 F.3d 1283,1289 (11th Cir. 2010) (clarifying that, in order to survive a

Rule 12 motion, a plaintiff need only put forth "enough fact[s] to raise a reasonable expectation that **discovery** will reveal evidence of [his] claim[s]").

XI.    IN HOLDING THAT RICO'S *CLOSED*-ENDED CONTINUITY REQUIREMENTS ARE NOT SATISFIED HERE, THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY FAILING TO TAKE THE FACTUAL ALLEGATIONS OF THE COMPLAINT AS TRUE INSOFAR AS THEY RELATE TO THOSE PARTICULAR REQUIREMENTS.

Here, in holding that Plaintiff has failed to demonstrate *closed*-ended continuity for a civil RICO violation—a cause of action which has more flexible requirements than those for criminal RICO violations—the district court's ruling squarely flouts the flexible "continuity plus relationship" test promulgated by the Supreme Court itself for civil RICO claims. See, e.g., H.J., Inc., 492 U.S. at 239 (1989) (citing S. Rep. No. 617, 91st Cong., 1st Sess. at 158 (1969) and 116 Cong. Rec. 18940 (1970) (remarks of Sen. McClellan)); Grubbs v. Sheakley Group, Inc., 807 F.3d 785, 804 (6th Cir. 2015); Bible v. United Student Aid Funds, Inc., 799 F.3d 633,659 (7th Cir. 2015); Stonebridge Collection, Inc. v. Carmichael, 791 F.3d 811,823 (8th Cir. 2015). That particular test is relevant here due to the fact that the district court below erroneously concluded that the alleged tortious conduct in this action failed to satisfy closed-ended continuity because the tortious acts only occurred over a period of several years, involved only a few predicate acts, and targeted only one victim.[23]

---

[23] But see H.J., Inc., 492 U.S. at 230 (clarifying that, for a RICO violation, specific bad acts are deemed to be "related" to the underlying RICO scheme if they "have

The Seventh Circuit's binding precedent in <u>DeGuelle v. Camilli</u>, 664 F.3d 192 (7th Cir. 2011) is a factually-analogous "one victim" *closed*-ended RICO case, and also elucidates how the "continuity plus relationship" test is to be applied in an employment retaliation context such as this one. In <u>DeGuelle</u>, the plaintiff employee was fired by the defendant employer after he accused the company of improperly receiving foreign tax credits. <u>DeGuelle</u>, 664 F.3d at 195. Just as in the case at bar, shortly after the plaintiff employee openly voiced his concerns of improper conduct within the company, the defendant employer suddenly and "coincidentally" decided to begin "investigating [the plaintiff] for misconduct relating to his [alleged] disclosure of confidential business documents outside of the company." <u>Id.</u> at 198. And just as in the instant case, the defendant employer also: (1) "made disparaging comments about [the plaintiff] in front of other [company] employees[,]" <u>id.</u> at 196; (2) "coincidentally" decided to give the plaintiff a "negative six-month performance review[,]" <u>id.</u>; (3) "coincidentally" began investigating the plaintiff for "misconduct relating to his [alleged] disclosure of confidential business documents outside of the company[24][,]" <u>id.</u>; (4) terminated the plaintiff from his employment at the company

the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.").

[24] Of note, in <u>DeGuelle</u>, the plaintiff employee—just as Plaintiff in the case at bar—was conveniently and "coincidentally" accused of misconduct as a pretext for firing him, falsely alleging that the plaintiff had divulged "confidential business

for supposedly "being untruthful[,]" id. at 198; (5) initiated legal proceedings against the plaintiff employee, maliciously suing him even after they had already fired him, id.; and (5) made "defamatory statements against [the plaintiff] that were published in local media outlets[,]" id. In response to all of the foregoing retaliatory employment actions, the plaintiff employee thereupon brought a civil RICO action against the defendant employer, asserting both RICO and RICO conspiracy claims. Id.

After the defendant employer moved to dismiss, the district court granted that Rule 12 motion and dismissed the RICO and RICO conspiracy claims "*with prejudice*" (*i.e.*, just as in the case at bar). Id. On appeal, the circuit court reversed the district court's dismissal of the RICO and RICO conspiracy claims, holding *inter alia* that the alleged employment retaliation was sufficient for closed-ended continuity under the Supreme Court's so-called "continuity plus relationship" test. Id. at

---

documents" outside of the company. And as the Seventh Circuit correctly concluded, that convenient, self-serving pretext for firing the DeGuelle plaintiff in no way implied that the defendant employer could not possibly have been retaliating against him for something entirely different (*e.g.*, for having previously voiced concerns of unlawful conduct within the company). Nor could that "coincidental" allegation against the plaintiff employee prevent him from asserting a civil RICO claim based upon alleged employment retaliation. Of course, if an employer could defeat a retaliation claim on a Rule 12 motion by coming up with a facially-plausible explanation for their actions *after the fact*—precisely what Defendants have done here—no employment retaliation claim could ever survive the Rule 12 stage. If that were the law in the Eleventh Circuit, and fortunately it isn't, any defendant employer could simply come up with a facially-plausible explanation for their adverse actions against the employee *post hoc*, and then have the entire case dismissed immediately on a Rule 12 motion—no questions asked, and no discovery needed.

203. The circuit court determined that the plaintiff had, in fact, satisfied RICO's *closed*-ended continuity requirement due to the fact that—taking the complaint's allegations as true—the defendant employer's true, underlying motive for terminating the plaintiff was to retaliate against him for having voiced concerns about improper conduct within the company. The Seventh Circuit reasoned that the alleged "[r]etaliatory acts [were] inherently connected to the underlying wrongdoing exposed by the [plaintiff employee] whistleblower[,]" thereby satisfying the "continuity plus relationship" test for civil RICO claims in an employment retaliation context.[25] See id. at 201.[26]

    In the case at bar, the well-pleaded allegations and timeline of events could not possibly be any clearer: Plaintiff voiced his concerns of inappropriate and unethical conduct within the Miami USAO *weeks* before the April 10, 2018 hearing, and Defendants subsequently engaged in numerous retaliatory actions against him for

---

[25] accord Vierria v. Cal. Highway Patrol, 644 F. Supp. 2d 1219,1236-37 (E.D. Cal. 2009) (retaliatory discharge of plaintiff employee constituted "**racketeering activity**" under section 1513(e)).

[26] Under the RICO statute, it is unlawful to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" through the commission of at least two "predicate acts" of racketeering within a span of ten years. However, in enacting the Sarbanes-Oxley Act ("SOX") in 2002, Congress specifically added "*retaliation*" for to the list of statutorily-defined predicate acts—something which the district court below appears to have inadvertently overlooked.

having done so. And at this early Rule 12 stage of the proceeding, the district court had no authority to discredit those averments.

XII.    ON THE CIVIL RICO CONSPIRACY COUNT, THE DISTRICT COURT ERRRED IN FAILING TO CONSIDER THAT A REASONABLE FACTFINDER MAY INFER, AT THE TIME OF TRIAL, THAT EACH DEFENDANT "AGREED TO THE OVERALL OBJECTIVE OF THE CONSPIRACY."

Next, the district court dismissed the civil RICO count "with prejudice" after concluding that Plaintiff's allegations "do not establish that the defendants *agreed* to commit two predicate acts[.]" D.E. 78 at 1. However, it is respectfully submitted that the district court inadvertently overlooked the fact that Plaintiff was never required to "establish" or prove any agreement in the first place.

"A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935,950 (11th Cir. 1997) (quoting United States v. Church, 955 F.2d 688,694 (11th Cir. 1992)). In the Eleventh Circuit, a plaintiff need not offer direct evidence of any "agreement" between the civil RICO co-conspirators; instead, **the existence of such an agreement "may be *inferred* from the conduct of the participants."** Id. at 950 (quoting Church, *supra* at 695). And this is particularly true here where the district court declined to allow discovery, yet, in the same breath, faulted Plaintiff for failing to shore up

49

evidence relating to the communications between Defendants. Plaintiff should be afforded a meaningful opportunity to obtain additional factual support to bolster his claims, and to do so through routine discovery requests.

XIII.    THE DISTRICT COURT BELOW ERRED IN DISMISSING THE FICTITIOUS-PARTY "JOHN DOE" DEFENDANTS AT THE PRE-DISCOVERY RULE 12 STAGE; THIS COURT SHOULD AVOID A CIRCUIT SPLIT BETWEEN THE ELEVENTH CIRCUIT AND THE FIFTH CIRCUIT ON THIS PARTICULAR ISSUE.

As a matter of procedural due process, Plaintiff has the right to discover and identify the true identities of all parties involved in the scheme through either: (1) limited discovery; or (2) ordinary discovery practice. But here, the pre-discovery "with prejudice" dismissal of the fictitious-party defendants deprived Plaintiff of his right to do so (and to toll the statute of limitations vis-à-vis his claims against those defendants). This is particularly true in the case at bar, where Plaintiff is still being prevented from timely identifying these individuals due in large part Defendants' ongoing interference with Plaintiff's outstanding **December 2018** FOIA/PA re-quests.

Naturally, the true identities of these individuals can easily be uncovered through routine discovery requests (*e.g.*, a simple request for unredacted agency email communications). See Taylor v. Brooks, 2020 U.S. Dist. LEXIS 103575 (N.D. Ala. June 12, 2020); see also Green v. Doe, 260 F. App'x 717,719 (5th Cir. 2007) ("Although the use of a 'John Doe' is disfavored, it serves the legitimate function of

50

giving a plaintiff the opportunity to identify, through discovery, unknown defendants."). And this right to discovery makes perfect sense under the current "plausibility" pleading standard of <u>Iqbal</u> and <u>Twombly</u>. <u>See, e.g.</u>, <u>ADA v. Cigna Corp.</u>, 605 F.3d 1283 (11th Cir. 2010) (Dubina, C.J.) (noting that the new "plausibility" standard only calls for "enough fact to raise a reasonable expectation that *discovery* will reveal evidence" of the plaintiff's asserted claims).

## <u>CONCLUSION</u>

The two (2) appealed orders should be reversed, and the cause should be remanded to a different district-court judge for further proceedings.

At Cambridge, Massachusetts,  Respectfully submitted,
This 1st Day of April, 2022.

/s/ Jonathan Mullane
JONATHAN MULLANE
6 Bennett Street
Cambridge, MA 02138
Tel.: (617) 800-6925
j.mullane@icloud.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 12,972 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Jonathan Mullane

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this filing submitted via the CM/ECF system shall be transmitted electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and that (2) paper copies shall be mailed via certified mail, postage prepaid, addressed as specified below:

Emily M. Smachetti, Esq.
U.S. Attorney's Office
99 N.E. 4th Street
Miami, FL 33132
Tel.: (305) 961-9320
Emily.Smachetti@usdoj.gov

/s/ Jonathan Mullane
JONATHAN MULLANE